IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CROWN VILLAGE FARM, LLC,[1] | ) | Case No. 09-_____ (___) |
| | ) | |
| Debtor. | ) | |

**MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AN ORDER
(I) APPROVING BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (II) APPROVING
CERTAIN BIDDING PROTECTIONS, (III) APPROVING THE
FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES AND (IV) SCHEDULING A BIDDING PROCEDURES HEARING**

Crown Village Farm, LLC (the "Debtor"), as debtor in possession, files this motion (the "Motion"), pursuant to sections 105, 503, and 1123 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, attached hereto as Exhibit A (the "Bidding Procedures Order"):

    a.    approving proposed bidding procedures (the "Bidding Procedures"), as well as the proposed expense reimbursement, in connection with the sale (the "Sale") of substantially all of the Debtor's assets (collectively, the "Assets");

    b.    scheduling an auction (the "Auction") and a hearing to consider approval of the Sale in conjunction with the hearing to consider confirmation of the Plan (the "Confirmation Hearing"); and

---

[1] The last four digits of the Debtor's federal tax identification number is 1377. The Debtor's address is 8219 Leesburg Pike, Suite 300, Vienna, Virginia 22182; after May 31, 2009, the Debtor's address will be 10475 Fortune Parkway, Suite 100, Jacksonville, Florida 32256.

DLI-6224863v16
RLF1-3392535-1

c. approving the form and manner of notice of the Auction, including the form and manner of service of the notice (the "<u>Auction Notice</u>") attached as Annex 2 to the proposed order attached hereto as Exhibit A (the "<u>Bidding Procedures Order</u>") and the notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached to the Bidding Procedures Order as Annex 3 (the "<u>Assumption and Assignment Notice</u>").

In support of this Motion, the Debtor respectfully states as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

2. On May 1, 2009 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3. Contemporaneously with the filing of this Motion, the Debtor filed (a) the Declaration of Wayne Janzik in Support of Certain Motions Filed on the Petition Date, (b) the Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Plan of Reorganization of Crown Village Farm, LLC (as it may be amended or modified, the "<u>Disclosure Statement</u>"), and (c) the Plan of Reorganization of Crown Village Farm, LLC (as it may be amended or modified, the "<u>Plan</u>"), which are incorporated herein by reference.

### *Events Leading to the Debtor's Bankruptcy Filing and the Proposed Sale*

4. The Assets to be sold pursuant to the Stalking Horse Agreement (as such capitalized term is defined below) and the Plan consist primarily of approximately 178 acres of certain real property located in the City of Gaithersburg, Montgomery County, Maryland (the

"Crown Property"). In 2005, KB Home Maryland, Inc. ("KB Maryland")[2] and Centex Homes Crown, LLC ("Centex Crown" and, together with KB Maryland, the "Members") formed the Debtor as a joint venture to acquire the Crown Property and develop it into 2,250 residential units and 320,000 square feet of retail/commercial space (the "Project"). To finance the Project, on September 15, 2005, the Debtor entered into a Secured Credit Facility Agreement (the "Credit Agreement") with Bank of America, N.A. (as successor in interest to LaSalle Bank National Association), as Prepetition Agent and arranger (the "Prepetition Agent") and a lender, and the other lenders party thereto (collectively, the "Lenders"). Under the Credit Agreement, the amount available to the Debtor at any one time is capped at an amount equal to 67.5% of the lesser of the net book value or current market value of the Crown Property, as adjusted periodically (the "Maximum Available Commitment").

5. In May 2008, the Debtor initiated a formal process to solicit bids for the sale of the Crown Property. The Debtor produced certain marketing and presentation materials and, by the end of July 2008, had forwarded those materials to 72 separate firms that the Debtor identified as potential purchasers of the Crown Property. Of the 72 prospective purchasers, nine submitted bids for the Crown Property. Each of the nine bids was for significantly less than the market value of the Crown Property as determined by an June 2008 appraisal ordered by the Prepetition Agent. The Debtor abandoned its sale efforts shortly thereafter, due to the lack of legitimate interest.

6. As a result of the June 2008 appraisal of the Crown Property performed at the Prepetition Agent's request, the Prepetition Agent determined that the Debtor's

---

[2] All references to KB Home Maryland Inc., a Delaware corporation, include KB HOME Maryland LLC, a Delaware limited liability company and the successor to KB Home Maryland Inc. as a result of a statutory conversion completed on April 17, 2009.

then-outstanding borrowings exceeded the Maximum Available Commitment. After the Debtor and the Members failed to pay down the borrowings under the Credit Agreement to the Maximum Available Commitment, the Prepetition Agent notified the Debtor and KB Home, Inc. ("KB Home") and Centex Homes, the ultimate corporate parents of each of the Members and guarantors of certain of the Debtor's obligations under the Credit Agreement, that certain events of default existed under the Credit Agreement, including (a) the failure to pay down the borrowings to the Maximum Available Commitment, (b) the failure to pay interest and fees payable under the loan documents, (c) the failure to commence or diligently pursue development work on the Crown Property, and (d) the failure to pay the principal on September 15, 2008, the maturity date under the Credit Agreement.

7. After extensive negotiations, the Debtor, KB Home and Centex Homes entered into a Forbearance Agreement (the "Forbearance Agreement") with the Lenders on October 1, 2008 whereby the Lenders agreed to refrain from exercising their rights under the Credit Agreement through November 14, 2008.

8. During the period covered by the Forbearance Agreement, the parties continued to explore various strategic alternatives and ultimately concluded that a chapter 11 restructuring of the Debtor, which would include the sale of the Crown Property to the highest bidder at an auction, represented the best available option. To allow the parties additional time to negotiate the terms that would govern the prospective bankruptcy sale and chapter 11 plan, the Prepetition Agent agreed to further extend the time period under the Forbearance Agreement during which it would refrain from exercising the Lenders' rights under the Credit Agreement through December 31, 2008. Although the Lenders did not formally extend the forbearance period, the parties continued to discuss alternatives and ultimately reached an agreement on the

terms of the Debtor's chapter 11 bankruptcy filing, and a general agreement on the terms of the Plan, including the auction and sale of the Crown Property, which is memorialized in the Plan Support Agreement (the "Plan Support Agreement").

9. Under the Plan Support Agreement, KB Maryland and Centex Homes have agreed to provide limited postpetition financing to the Debtor to permit the Sale of the Assets pursuant to the Plan. In addition, the Debtor has negotiated the terms of an asset acquisition agreement (the "Stalking Horse Agreement")[3] with the Members, pursuant to which the Members, through CVF Operating Company, LLC ("Newco"), an acquisition entity, have agreed to act as a stalking horse bidder for the Sale of the Assets. As noted above, concurrently with the commencement of this chapter 11 case and the filing of this Motion, the Debtor has filed the Plan, which contemplates the Sale of the Assets to Newco or the highest bidder at the Auction and establishes procedures to distribute the proceeds of the Sale among the Debtor's creditors in accordance with the priorities established under the Bankruptcy Code.[4]

10. The principal terms of the Stalking Horse Agreement are summarized in the Disclosure Statement. The Stalking Horse Agreement includes certain bidding protections for Newco. In particular, subject to Court approval as part of the Bidding Procedures Order, in the event the Stalking Horse Agreement is terminated following Bankruptcy Court approval of an acquisition proposal with a third party, the Debtor will be required to reimburse Newco for its reasonable actual out-of-pocket expenses incurred in connection with the negotiation, preparation, execution, delivery and attempted performance of the Stalking Horse Agreement up to a maximum amount of $500,000 (the "Expense Reimbursement"). The Expense

---

[3] A copy of the Stalking Horse Agreement is attached hereto as Exhibit B.

[4] As the Sale of Assets will be pursuant to the Plan, no separate motion to approve the sale pursuant to Bankruptcy Code section 363 will be filed.

Reimbursement will be paid to Newco no later than the date of consummation of a sale of all or substantially all of the Assets to a third party. The Expense Reimbursement will be paid as an administrative expense under section 507(a) of the Bankruptcy Code from the proceeds of the sale to such third-party acquirer to the extent the sale generates proceeds in excess of the amounts due in respect of the Credit Agreement.

11. The Debtor believes that entry into the Stalking Horse Agreement for the sale of the Debtor's Assets, or such other agreement that the Debtor enters into with the prevailing bidder at the Auction, if that result can be effectuated, represents the best possible outcome for this case.

## III. RELIEF REQUESTED

12. As a result of the foregoing, by this Motion, pursuant to the Plan and sections 105, 503 and 1123 of the Bankruptcy Code, the Debtor seeks entry of the Bidding Procedures Order:

a. approving (i) the Debtor's proposed Bidding Procedures for marketing the Assets, which procedures are attached as Annex 1 to the Bidding Procedures Order; (ii) the Auction Notice; and (iii) the Assumption and Assignment Notice;

b. approving the Expense Reimbursement for the benefit of Newco;

c. establishing July 27, 2009 at 12:00 p.m. (Eastern Time) as the deadline for the submission of bids (the "Bid Deadline");

d. scheduling the Auction, if necessary, no later than July 29, 2009; and

e. considering the sale of the Assets to Newco or such other party that is the successful bidder at the Auction as part of the Confirmation Hearing.

## *The Proposed Bidding Procedures*

13. The Debtor is requesting that the Court approve Bidding Procedures for the sale of the Assets with a Confirmation Hearing to occur near the end of July.[5] The following is a summary, pursuant to Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States District Court for the District of Delaware ("Local Rules"), of the Debtor's proposed Bidding Procedures.[6]

14. Participation Requirements. Unless otherwise ordered by the Court for cause shown, to participate in the bidding process, each person or entity will be required to deliver (unless previously delivered) to the Debtor, on or before the Bid Deadline, an executed confidentiality agreement in form and substance satisfactory to the Debtor (the "Confidentiality Agreement"). Each person or entity that delivers the Confidentiality Agreement to the Debtor on or before the Bid Deadline is hereinafter referred to as a "Potential Bidder." **After a Potential Bidder delivers the Confidentiality Agreement, the Debtor will deliver or make available (unless previously delivered or made available) to each Potential Bidder satisfying the criteria enumerated herein certain designated information in respect of the Assets.** See Local Rule 6004-1(c)(i)(A).

15. Determination by the Debtor. The Debtor, in consultation with any official committee of unsecured creditors appointed in this chapter 11 case (the "Committee") and the Lenders, will (a) coordinate the efforts of Potential Bidders in conducting their respective

---

[5] The proposed form of Bidding Procedures Order contains the Debtor's proposed dates, which are subject to the availability of the Court and may change.

[6] Because the Debtor is not seeking approval of the Sale of the Assets pursuant to section 363 of the Bankruptcy Code, the Debtor does not believe that Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") applies. For the convenience of the Court and parties in interest, however, the Bidding Procedures summary herein highlights, in boldface text, the provisions required by Local Rule 6004-1.

due diligence, (b) evaluate bids from Potential Bidders, (c) negotiate any bid made to acquire the Assets and (d) make such other determinations as are provided in the Bidding Procedures. Neither the Debtor nor its representatives will be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

16. <u>Due Diligence</u>. The Debtor will afford any Potential Bidder such due diligence access or additional information as may be requested by the Potential Bidder that the Debtor, in its business judgment, determines to be reasonable and appropriate, but any nonpublic information provided to a Potential Bidder that has not been previously provided to Newco shall promptly be provided to Newco. The Debtor may designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders. No additional due diligence information will be required to be made available to Potential Bidders after the Bid Deadline.

17. **<u>Bid Deadline</u>. On or before the Bid Deadline, a Potential Bidder that desires to make a bid is required to deliver written copies of its bid by facsimile and email to the representatives of the Debtor, the Committee, and the Lenders.** <u>See</u> Local Rule 6004(c)(i)(B).

18. **<u>Bid Requirements</u>. All bids must be accompanied by a letter: (a) offering to acquire the Assets, accompanied by an agreement attached to the letter, marked to show any proposed amendments and modifications to the Stalking Horse Agreement (the "<u>Marked Agreement</u>"); (b) agreeing that the Potential Bidder's offer is binding and irrevocable until 48 hours after the earlier of (i) the closing of the Sale of the Assets, (ii) the withdrawal of the Assets for sale by the Debtor or (iii) 30 days after the Confirmation Hearing; and (c) offering to pay a price greater than the aggregate**

consideration offered by Newco pursuant to the Stalking Horse Agreement by the amount of at least $1,000,000, plus the Expense Reimbursement (the "Initial Bid Increment"). See Local Rule 6004(c)(i)(B). Bids must be cash-only bids and accompanied by (a) a certified check or wire transfer in the amount of $1,000,000 payable to the order of the Debtor (a "Good Faith Deposit") and (b) written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (provided, however, that the closing of the Sale shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction as the Debtor may reasonably request. See Local Rule 6004(c)(i)(B). The Debtor, in consultation with any Committee and the Lenders, will review each bid received from a Potential Bidder to ensure that it meets the requirements set forth above. A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." The Debtor, in consultation with any Committee and the Lenders, will determine whether each bid meets the requirements of a Qualified Bid. The Stalking Horse Agreement is a Qualified Bid, and Newco is a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that Potential Bidders must satisfy to be a Qualified Bidder. The Debtor may value a Qualified Bid based upon any and all factors that the Debtor deems pertinent, including, among others: (a) the amount of the Qualified Bid, (b) the risks and timing associated with consummating a transaction with the Potential Bidder, (c) any excluded Assets or executory contracts and leases, and (d) any other factors that the Debtor may deem relevant to the Sale in consultation with any Committee and the Lenders. The Debtor, in

its business judgment, and in consultation with any Committee and the Lenders, reserves the right to reject any bid if the bid is not a Qualified Bid or because the bid:

    a.    is on terms that are more burdensome or conditional than the terms of the Stalking Horse Agreement;

    b.    requires any indemnification of such Potential Bidder in its Marked Agreement;

    c.    is not received by the Bid Deadline;

    d.    includes non-cash consideration; or

    e.    is subject to any due diligence, financing condition or other contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the Assets other than as may be included in the Stalking Horse Agreement.

19.    <u>Auction Participation</u>. Unless otherwise ordered by the Court for cause shown, only Newco and each Potential Bidder that has submitted a Qualified Bid are eligible to participate at the Auction described below. At least one business day prior to the Auction, each Potential Bidder that has submitted a Qualified Bid must inform the Debtor whether it intends to participate in the Auction. The Debtor will promptly thereafter inform in writing each Potential Bidder that has expressed its intent to participate in the Auction of the identity of all other Potential Bidders that may participate in the Auction. The Debtor will provide copies of all other Qualified Bids at the request of such Potential Bidders. If the Debtor does not receive any Qualified Bids other than the Stalking Horse Agreement, it will not hold an Auction, the Stalking Horse Agreement will be the Successful Bid and Newco will be named the Successful Bidder. If more than one Qualified Bid has been received, the Debtor will conduct the Auction for the sale

of the Assets. The Debtor proposes that the Auction take place at 12:00 p.m. (Eastern Time) on July 29, 2009 at the offices of counsel for the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801. At the Auction, participants will be permitted to increase their bids. The bidding will start at the aggregate consideration for the Assets and terms proposed in the Qualified Bid that the Debtor selects as the highest and best offer prior to the Auction, plus the Initial Bid Increment if Newco is the party that has made the highest and best offer, and will continue in increments of at least $1,000,000 in cash, subject to the right of Newco to credit the Expense Reimbursement to its bid only once in accordance with Section 7.7(e) of the Stalking Horse Agreement. If a bidder's Qualified Bid other than Newco's is selected as the highest and best offer, then the bidding will start at the aggregate consideration for the Assets and terms proposed in that Qualified Bid plus $1,000,000 in cash, and will continue in increments of at least $1,000,000 in cash, subject to the right of Newco to credit the Expense Reimbursement to its bid only once in accordance with Section 7.7(e) of the Stalking Horse Agreement. **The Debtor may alter the Bidding Procedures at the Auction if, in its reasonable judgment, in consultation with any Committee and the Lenders, such alteration will better promote the goals of the Auction.** See Local Rule 6004-1(c)(i)(D). The Debtor, in consultation with any Committee and the Lenders, will continue to accept timely bids until there is only one Qualified Bid that the Debtor determines in its reasonable business judgment, and after consultation with any Committee and the Lenders, is the highest and best Qualified Bid (the "Successful Bid"). At the close of the Auction, the Debtor will identify which Qualified Bidder made the Successful Bid and such Qualified Bidder will be the "Successful Bidder." All bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waived any right to jury trial in

connection with any disputes relating to the Auction, the sale of the Assets and the construction and enforcement of the Stalking Horse Agreement.

20. <u>Acceptance of Qualified Bids</u>. The Debtor may (a) determine, in its reasonable business judgment, in consultation with the Committee and the Lenders, which Qualified Bid is the Successful Bid and the next best bid (the "<u>Next Best Bid</u>"); and (b) reject at any time before entry of the order confirming the Plan any bid, other than the Stalking Horse Agreement, that, in the Debtor's reasonable judgment, after consultation with the Committee and the Lenders, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale or (iii) contrary to the best interests of the Debtor and its estate. The Debtor presently intends to convey the Assets to the Qualified Bidder that submits the Successful Bid, whether such entity is Newco or another Qualified Bidder. The Debtor's presentation to this Court for approval of the selected bid as the Successful Bid does not constitute the Debtor's acceptance of the bid. The Debtor will have accepted a Qualified Bid only when such Qualified Bid has been approved by the Court at the Confirmation Hearing. The Debtor and the Successful Bidder will close the Sale on or before August 31, 2009. **If the Successful Bidder does not close the Sale by such date, then the Debtor will be authorized, but not required, to close with the party that submitted the Next Best Bid (the "<u>Next Best Bidder</u>"), without a further court order.** <u>See</u> Local Rule 6004(c)(i)(E). If the Debtor decides to close with the Next Best Bidder, the Debtor and the Next Best Bidder will have an additional 15 days to close the Sale.

21. <u>No Fees for Potential Bidders or Qualified Bidders</u>. Except for Newco with respect to the Expense Reimbursement, no Potential Bidders or Qualified Bidders will be allowed any break-up, termination or similar fee. Moreover, neither the tendering of a bid nor

the determination that a bid is a Qualified Bid will entitle a Potential Bidder or Qualified Bidder to any break-up, termination or similar fee and all Potential Bidders and Qualified Bidders waive any right to seek a claim for substantial contribution.

22. The Debtor believes that the proposed Bid Procedures provide an appropriate framework for selling the Assets and will enable the Debtor to review, analyze and compare all Bids received to determine which Bid is in the best interests of the Debtor's estate and creditors.

23. <u>Marketing</u>. In order to increase the opportunity for the Debtor to receive competitive bids for the purchase of the Crown Property at the Auction, the Debtor will engage in an extensive marketing process. The Debtor's marketing efforts will include the publication of information concerning the Auction and a description of the Crown Property in the real estate section of the Wall Street Journal and several regional newspapers, the publication of similar information on a regional builder's association e-newsletter, as well as a significant direct mailing campaign, and the use of interlink services. In addition, the Debtors will solicit bids from national land acquirers listed in the Members' existing contact databases. Finally, the Debtor intends to hire an experienced commercial real estate broker to market the sale of the Crown Property. These efforts are designed to ensure that information concerning the Auction and sale of the Crown Property reaches as wide an audience of potential bidders as possible, in the most useful format available.

***Proposed Stalking Horse Bidding Protections***

24. **As part of the Bidding Procedures Order, the Debtor is also requesting approval of the provisions of the Stalking Horse Agreement regarding the payment of the Expense Reimbursement, on the terms and conditions set forth in the Stalking Horse Agreement.** <u>See</u> Local Rule 6004-1(c)(i)(C). Newco insisted that these

provisions be included in the Stalking Horse Agreement for Newco to act as a stalking horse bidder. If approved by this Court, the Debtor would be required to pay Newco the Expense Reimbursement if and to the extent the Expense Reimbursement becomes payable under the terms of the Stalking Horse Agreement.

25. Under Third Circuit precedent, expense reimbursements constitute administrative expenses, and therefore, the payment of such expenses must provide a postpetition benefit to the bankruptcy estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999). In O'Brien, the Third Circuit provided two examples of a potential benefit accruing from the payment of a termination fee. Id. First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, break-up fees and expense reimbursements encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

26. The Debtor submits that the proposed Expense Reimbursement will not chill bidding, is reasonable and will enable the Debtor to maximize the value of its estate. The Stalking Horse Agreement establishes a legitimate price floor allowing the Debtor to evaluate properly other competing bids that may be materially higher or otherwise better than Newco's bid. In addition, the maximum amount of the Expense Reimbursement will represent less than 1% of the approximately $70 million value that the Debtor ascribes to the Stalking Horse Agreement. This percentage is less than the break-up fees and expense reimbursements previously approved in this jurisdiction. See, e.g., In re Boscov's, Inc., Case No. 08-11637 (KG) (Bankr. D. Del. Oct. 1. 2008) (approving expense reimbursement and 2% break-up fee); In re

Dura Auto. Sys., 2007 Bankr. LEXIS 2764, at *319-20 (Bankr. D. Del. Aug. 15, 2007) (Carey, J.) (authorizing both expense reimbursement and break-up fee); In re Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) (authorizing debtors to offer up to 3% break-up fee if asset purchase agreement executed by a specified deadline); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 12, 2007) (approximately 2% break-up fee awarded); In re Women First Health Care, Case No. 04-11278 (MFW) (Bankr. D. Del. Sept. 8, 2004) (approving both expense reimbursement and 2% break-up fee); In re Decora Indus., Inc., 2002 WL 32332749 (D. Del. May 20, 2002) (Farnan, J.) (appellate court approving both expense reimbursement and 3% break-up fee).

***Proposed Notice of the Auction and the Confirmation Hearing,
During Which the Court Will Consider Approval of the Sale***

27. The Debtor proposes that the Court set 4:00 p.m. (Eastern Time) on Thursday, July 16, 2009 as the deadline for objecting to approval of the proposed Sale, which should also correspond with the deadline to be set for objecting to confirmation of the Plan (the "Objection Deadline"). The Debtor also proposes that the Court consider approval of the Sale at the same time as the Confirmation Hearing.

28. The Debtor has served, or will serve, this Motion on: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Lenders; (c) counsel to KB Home Maryland, Inc.; (d) counsel to Centex Homes Crown LLC; (e) the Debtor's largest unsecured creditors, as identified in the Debtor's chapter 11 petition; (f) all parties that are known to claim interests in or liens upon the Assets; (g) nondebtor parties to the Assumed and Assigned Agreements; and (h) all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities, including the Internal Revenue Service and the Environmental Protection Agency.

29. The Auction Notice will include, among other things, the date, time and place of the Auction and the Confirmation Hearing and the deadline for filing any objections to the relief requested in this Motion and the Plan once they are set by the Court, and, therefore, complies with Bankruptcy Rule 2002(c). The Auction Notice will be served on all known creditors of the Debtor. The Auction Notice includes instructions for how to obtain a copy of the Disclosure Statement, the Plan and the Bidding Procedures Order.

30. The Debtor submits that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed Bidding Procedures and the sale of the Assets. Therefore, the Debtor respectfully requests that this Court approve the notice procedures proposed above.

*The Proposed Notice of the Assumption and Assignment of Executory Contracts and Unexpired Leases*

31. Additionally, the Debtor, as part of the Sale, may assume and assign certain executory contracts and unexpired leases. As soon as practicable, but no later than May 22, 2009, the Debtor will file a schedule of cure obligations (the "Cure Schedule") for the Assumed and Assigned Agreements. The Cure Schedule will include a description of each Assumed and Assigned Agreement potentially to be assumed and assigned under the Stalking Horse Agreement or a Marked Agreement, as applicable, and the amount, if any, the Debtor believes is necessary to cure such agreements pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the nondebtor parties listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the Court. The Debtor proposes that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, objections relating to adequate

assurance of future performance by Newco or to the Cure Costs set forth on such schedule, must be in writing, filed with the Court, and be actually received on or before the Objection Deadline by the Debtor, Crown Village Farm, LLC, 10475 Fortune Parkway, Suite 100, Jacksonville, FL 32256 (Attn: Wayne Janzik), with copies to (a) proposed counsel to the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi); (b) counsel to the Prepetition Agent, Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, Texas 75219 (Attn: Robert D. Albergotti); (c) counsel to KB Home Maryland, Inc., Jones Day, 2727 N. Harwood Street, Dallas, TX 75201 (Attn: Gregory M. Gordon and Daniel P. Winikka); (d) counsel to Centex Homes Crown LLC, Baker Botts L.L.P., 2001 Ross Ave., Dallas, TX 75201 (Attn: Judith W. Ross); and (e) if one is formed, counsel to the Committee (collectively, the "Notice Parties"); provided, however, that in the event the Auction results in a Successful Bidder other than Newco, the deadline for objecting to the assignment of the Assumed and Assigned Agreements to such Successful Bidder on the basis of adequate assurance of future performance will be the commencement of the Confirmation Hearing. Any objection to the Cure Costs shall set forth a specific default in any Assumed and Assigned Agreements and claim a specific monetary amount that differs from the amount (if any) specified by the Debtor in the Cure Schedule.

32. If no objections are received, then the Cure Costs set forth in the Cure Schedule will be binding upon the nondebtor parties to the Assumed and Assigned Agreements for all purposes in this chapter 11 case and will constitute a final determination of the total Cure Costs required to be paid by the Debtor in connection with the assumption and assignment of the Assumed and Assigned Agreements. In addition, all counterparties to the Assumed and Assigned Agreements will (a) be forever barred from asserting any additional cure or other

amounts with respect to the Assumed and Assigned Agreements, and the Debtor and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice; (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtor or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

33. Where a nondebtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Costs (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Confirmation Hearing, and subject to the Successful Bidder's consent to such consensual resolution, the Debtor shall promptly provide any Committee and the Successful Bidder notice and opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Confirmation Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Confirmation Hearing or at such other date and time as may be fixed by this Court. All other objections to the proposed assumption and assignment of an Assumed and Assigned Agreement will be heard at the Confirmation Hearing. The Debtor intends to cooperate with counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences in a particular cure amount.

34. The Debtor requests that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired

lease under section 365 of the Bankruptcy Code. See In re Decora Indus., 2002 WL 32332377, at *4 (Bankr. D. Del. May 17, 2002) (parties in interest who did not object to sale were deemed to accept the sale pursuant to sections 362(f) and 365 of the Bankruptcy Code); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtor requests that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## IV. NOTICE

35. Notice of this Motion has been given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Lenders; (c) counsel to KB Home Maryland, Inc.; (d) counsel to Centex Homes Crown LLC; (e) the Debtor's largest unsecured creditors, as identified in the Debtor's chapter 11 petition; (f) all parties that are known to claim interests in or liens upon the Assets; (g) nondebtor parties to the Assumed and Assigned Agreements; and (h) all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities, including the Internal Revenue Service and the Environmental Protection Agency. In light of the nature of the relief requested, the Debtor submits that no other or further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Bidding Procedures Order in substantially the form attached hereto as Exhibit A and (ii) grant such other and further relief to the Debtor as the Court may deem proper.

Dated: May 1, 2009  
       Wilmington, Delaware

Respectfully submitted,

/s/ Chun I. Jang
_____
Daniel J. DeFranceschi (No. 2732)
Chun I. Jang (No. 4790)
Katisha D. Fortune (No. 4857)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Proposed Counsel for Debtor and Debtor-in-Possession*